## A97A1215. SINKFIELD v. OH et al.
### (495 SE2d 94)

Judge Harold R. Banke.

Lorrie Marie Sinkfield sued Shi-Han Oh, M.D., and Gerry Farmer, M.D., her treating obstetricians, after she suffered a miscarriage. Sinkfield challenges the summary judgment in favor of the defendant doctors.

Viewed in the light most favorable to Sinkfield, the non-movant, the evidence was as follows. Sinkfield began treatment with Drs. Oh and Farmer in late November 1992. From the time of her initial visit until the miscarriage on January 19, 1993, Sinkfield at various points complained of amniotic fluid leakage, vaginal bleeding, and abdominal and back pain. Before this pregnancy, she had experienced two prior miscarriages. In the latter part of December, Sinkfield's heavy bleeding and severe abdominal pain necessitated her hospitalization. On her release date of December 24, Dr. Farmer prescribed Motrin 800 for pain and lifted the total bed rest restriction prescribed by Dr. Oh. Sinkfield subsequently returned to work. On January 19, Sinkfield suffered a miscarriage, delivering a male fetus with a gestational age of 20 to 22 weeks. In the underlying action, she alleged that Drs. Oh and Farmer failed to properly diagnose her medical condition as a high risk pregnancy and failed to provide

appropriate medical treatment.

Sinkfield's expert, Verna A. Thornton, M.D., enumerated several deviations from proper care by her treating physicians including: failure to place Sinkfield on a contraction or fetal monitor, failure to prescribe any medication to stop premature contractions, negligently dismissing her from the hospital, failure to perform tests for fetal heart tones, failure to restrict her to complete bed rest with prescribed medicine, failure to test for leaking amniotic fluid and a deviation from the applicable standard of care by prescribing Motrin 800. On deposition, Dr. Thornton attested that prescribing Motrin was inappropriate because one of its side effects is a reduction of amniotic fluid. Five days before her physician prescribed Motrin, an ultrasound test indicated a normal amount of amniotic fluid. When Sinkfield delivered the stillborn fetus a month later, no amniotic fluid was present.

On summary judgment, the defendant physicians contended that even assuming arguendo that they had failed to provide appropriate care and treatment for Sinkfield's medical condition, Sinkfield failed to offer any evidence showing that their acts or omissions caused her miscarriage. In response, Sinkfield submitted the affidavit of Charles Proctor, Ph.D., a pharmacologist and toxicologist. Dr. Proctor claimed to have expert knowledge of the effects of dosages of Motrin on pregnant women and their fetuses at various stages of pregnancy. Dr. Proctor testified that it was his professional opinion that "the Motrin-800 (ibuprofen, 800 milligrams) prescribed by Dr. Gerry Farmer on December 24, 1992 was the predominate major contributing factor to the demise of the fetus of Lorrie Marie Sinkfield." According to Dr. Proctor, the fetus' demise "was precipitated by Motrin-800 (ibuprofen, 800 milligrams) induced Oligohydramnios (deficit in amniotic fluid)."

Finding that Dr. Proctor was not a medical doctor, the trial court rejected Dr. Proctor's testimony as "incompetent." The court held that because Sinkfield failed to establish by competent evidence that any breach of the applicable standard of care by the physicians caused or contributed to her injury, the physicians were entitled to summary judgment as a matter of law. *Held*:

1. The trial court erred in holding that the affidavit of Charles Proctor, Ph.D., was not competent evidence. In this procedural posture, summary judgment, Proctor's testimony was admissible evidence for the limited purpose for which it was offered — to show causation of the injury. It was not disputed that Dr. Proctor had expert knowledge, as he claimed, about various dosages of Motrin and the drug's effects on pregnant women and their fetuses. Instead, the defendant physicians asserted that Dr. Proctor was not competent to testify because "he is not a medical doctor, is not licensed to practice

medicine, nor is he permitted to write prescriptions."

However, this argument misses the mark because Dr. Proctor's testimony was not offered to address the applicable standard of care and any breach thereof, but to show causation. If Dr. Proctor, as a toxicologist and pharmacologist, had been offered as an expert witness against the two medical doctors for purposes of satisfying the strictures of OCGA § 9-11-9.1 (a), Dr. Proctor would not have been a competent witness. See *Hewett v. Kalish*, 264 Ga. 183, 186 (2) (442 SE2d 233) (1994). It is well settled that a professional expert affidavit for pleading purposes under OCGA § 9-11-9.1 (a) in a medical malpractice case must be from a person knowledgeable about the applicable standard of care that has allegedly been breached. See, e.g., *Handson v. HCA Health Svcs. of Ga.*, 264 Ga. 293, 294 (443 SE2d 831) (1994) (allopathic physician competent to testify as to osteopathic physician's care and skill); *Stubbs v. Ray*, 218 Ga. App. 420, 421 (1) (461 SE2d 906) (1995) (board-certified general surgeon shared overlapping expertise with defendant radiologist); *Crook v. Funk*, 214 Ga. App. 213, 215 (2) (447 SE2d 60) (1994) (physician competent to testify about competency of registered nurse).

Georgia law, however, does not mandate that only medical doctors be permitted to testify regarding medical issues; others with certain training and experience may testify on issues within the parameters of their expertise. *Goodman v. Lipman*, 197 Ga. App. 631, 633 (3) (399 SE2d 255) (1990); OCGA § 24-9-67. As we determined in *Goodman*, it was reversible error to exclude a pharmacologist's testimony in a medical malpractice case, where it had been offered as to the effects of particular drugs which had allegedly been improperly prescribed by a cardiologist. We held that the trial court erred in excluding the testimony of the pharmacologist because his testimony about the properties of the drugs at issue was relevant to the case. Id. Compare *Chandler v. Koenig*, 203 Ga. App. 684, 687 (417 SE2d 715) (1992) (pharmacologist who lacked overlapping professional expertise not competent to testify for purposes of OCGA § 9-11-9.1 (a), regarding the standard of care in the medical profession).

By definition, a pharmacologist is "one who makes a study of the actions of drugs." The Sloane-Dorland Annotated Medical-Legal Dictionary (1987 ed.). Pharmacology is "the study of drugs as to their chemistry, source, physical properties, preparation and physiological effects on living tissue, whether they be used in therapeutic amounts or otherwise, their absorption, their fats, their excretion and therapeutic indications for their use." *Colusa Remedy Co. v. United States*, 176 F2d 554, 558 (8th Cir. 1949). In this case, as in *Goodman*, Dr. Proctor, as an expert in the fields of pharmacology and toxicology, was competent to testify to the scientific effect of the particular drug at issue. See *Jordan v. Sante Fe Engineering*, 198 Ga. App. 600, 602-

603 (2) (b) (402 SE2d 304) (1991) (toxicologist qualified to testify as to the effect of certain substances on the body). We question whether a medical doctor's pharmacological training is generally comparable to that of a doctor of pharmacology. Thus, it is difficult to see what medically trained professional could have been more qualified to testify about the effects of the particular drug at issue than Dr. Proctor, who had earned a Ph.D. with a double major of pharmacology and toxicology from a prominent university.

Moreover, it is well settled that "[t]he opinions of experts on any question of science, skill, trade, or like questions shall always be admissible; and such opinions may be given on the facts as proved by other witnesses." OCGA § 24-9-67. Expert testimony, like Proctor's offered here, is admissible when it is helpful or necessary to prove disputed facts. See *Jones v. State*, 232 Ga. 762, 764 (2) (208 SE2d 850) (1974). We conclude that it was error to exclude Dr. Proctor's testimony on the limited issue for which it was offered.

Notwithstanding the physicians' contention to the contrary, *Riggins v. Wyatt*, 215 Ga. App. 854, 856 (452 SE2d 577) (1994) neither requires nor authorizes a different result. In *Riggins*, unlike here, the issue was whether a professor of biomechanics possessed the requisite overlapping expertise to qualify as an expert witness for pleading purposes under OCGA § 9-11-9.1 as to the standard of care applicable to an orthopedic surgeon. We held that he did not, a conclusion unrelated to the instant case. *Riggins*, 215 Ga. App. at 856.

The dissent misconstrues the meaning of *Chandler Exterminators v. Morris*, 262 Ga. 257 (2), 258 (3) (416 SE2d 277) (1992), which was overruled in part by an act of the legislature. Effective July 1, 1993, the General Assembly amended OCGA § 43-39-1 to legislatively overrule *Chandler Exterminators*, supra, to the extent that it held that a neuropsychologist is not qualified to render an opinion concerning the diagnosis of the pathology of organic brain disorders and brain damage. *Drake v. LaRue Constr. Co.*, 215 Ga. App. 453, 455 (2) (451 SE2d 792) (1994). Of course, it is axiomatic that no expert can testify outside the limits of his area of expertise.

2. Sinkfield contends that material issues remain as to whether Dr. Oh's and Farmer's treatment proximately caused her injury. She claims that the medical testimony sufficiently showed the parties dispute what caused the miscarriage. We agree. Her expert, Dr. Thornton, testified that although no single factor caused the miscarriage, in her professional opinion, Sinkfield miscarried primarily because of losing amniotic fluid and experiencing pre-term contractions. Dr. Proctor testified that it was his professional opinion that the Motrin 800 caused the deficit in the amniotic fluid and the demise of the fetus.

The dissent's insinuation that Dr. Proctor's testimony would not

be probative evidence to establish the cause of the miscarriage is repudiated by the physicians who concede in their appellate brief that Dr. Proctor's testimony, if admissible, would be probative as to the issue of the causation of the miscarriage. They acknowledge that "the affidavit of Charles Proctor, Ph.D. . . . addressed the sole allegation that the Motrin prescribed for Ms. Sinkfield by Dr. Farmer caused Ms. Sinkfield's miscarriage." They argue, "[o]nce Dr. Proctor's testimony is disregarded as to whether the Motrin proximately caused Appellant's miscarriage. . . ."

Moreover, the dissent's reliance on Sinkfield's prior medical history is unpersuasive because her next pregnancy, which was carefully monitored and treated as a high risk pregnancy, successfully concluded with the birth of a healthy baby boy. The fact that Sinkfield was threatening a miscarriage before the Motrin was prescribed does not resolve the disputed issue as to whether Motrin precipitated the miscarriage.

Notwithstanding the appellees' assertion to the contrary, the fact that Dr. Thornton was not able to "conclusively" testify as to the exact cause of the miscarriage does not, without more, prove the absence of proximate causation especially when considered in light of her testimony as a whole. See *Lee v. Satilla Health Svcs.*, 220 Ga. App. 885, 889 (2) (470 SE2d 461) (1996). Compare *Bonard v. Lowe's Home Centers*, 224 Ga. App. 85, 87 (2) (479 SE2d 784) (1996). Moreover, Dr. Proctor's uncontroverted testimony was that Motrin was the main cause of the injury. See *Matthews v. DeKalb County Hosp. Auth.*, 211 Ga. App. 858 (1), 859 (440 SE2d 743) (1994). Based on the record before us, we cannot say that disputed material factual issues regarding causation do not remain.

*Judgment reversed. McMurray, P. J., Pope, P. J., Beasley, Johnson, Smith and Eldridge, JJ., concur. McMurray, P. J., Pope, P. J., Johnson, Smith and Eldridge, JJ., also concur specially. Andrews, C. J., Birdsong, P. J., and Blackburn, J., dissent.*

ELDRIDGE, Judge, concurring specially.

While I concur totally with the majority, I feel compelled to address some of the issues raised in the dissent.

Stedman's Medical Dictionary, 22d defines pharmacology as "[t]he science that deals with drugs, their sources, appearance, chemistry, actions, and uses." Pharmacologist is defined as "[o]ne who specializes in pharmacology." Pharmacist is defined as "[a] druggist; a pharmaceutist; an apothecary; one who prepares and dispenses drugs and has knowledge concerning their properties." Pharmacy is defined as "[t]he act of preparing and dispensing drugs." Toxicology is defined as "[t]he science of poisons — their source, chemical composition, action, tests, and antidotes." Toxicologist is defined as "[o]ne

who has a special knowledge of poisons and their antidote." Physiology is defined as "[t]he science that deals with living things, with the normal vital processes of animal and vegetable organisms." Physiologist is defined as "[o]ne having special knowledge of, or whose vocation is the study of, physiology." Anatomy is defined as "1. [t]he structure of an organism; morphology. 2. The science of the morphology of structure of organisms. 3. Dissection. 4. A work describing the form and structure of an organism and its various parts." Cytology is defined as "[t]he anatomy, physiology, pathology, and chemistry of the cell." Biochemistry is defined as "[p]hysiological chemistry; biological chemistry; the chemistry of living organisms and of the changes occurring therein." Organic chemistry is defined as "the chemistry of carbon compounds and compounds containing covalent bonds." Medicine is defined as "[t]he art of preventing and curing disease; the science that treats of disease in all of its relations. The study and treatment of general diseases or those affecting the internal parts of the body, distinguished from surgery." Etiology is defined as "[c]ausation; the doctrine of causes, the study of causes; specifically, the cause of disease." Pharmacodynamics is defined as "[t]he study of the actions of drugs on the living organism." Pharmacodynamic is defined as "[r]elating to drug action." None of the above areas of scientific study and practice requires a medical degree by definition, but all are a limited part of the medical training for a medical degree, usually limited to a semester course on each subject; however, a Ph.D. in pharmacology has more hours of specialized study in such areas than is required of a medical student, who is trained as a generalist with knowledge in all areas of medicine. Essential to the science of pharmacology is the knowledge and understanding of the cause and effect of disease and toxins on the physiology of the body and the effect of drugs not only upon disease but also on the body. The very purpose of the study of pharmacology is the creation of drugs that work, which means that through drug trials on animals and clinical trials on humans that drug's effect on the disease and humans is determined.

To be a pharmacologist requires that the person know, understand, and have training in pathology, microbiology, mycology, cytology, the disease process, trauma, and toxicology, which are primarily medical specialties, in order to determine the action, contraindication, and use of drugs in treatment of the human; thus, pharmacology and toxicology are overlapping fields of science with medicine, and therefore, pharmacologists and toxicologists have knowledge as experts as to causation. Generally, the pharmacology and toxicology professors in medical schools are Ph.D.s instead of M.D.s, although some rare professors have dual degrees. OCGA § 43-34-20 (3) defines: " '[t]o practice medicine' means to hold one's self out to the public as

being engaged in the diagnosis or treatment of disease, defects, or injuries of human beings; or the suggestion, recommendation, or prescribing of any form of treatment for internal palliation, relief, or cure of any physical, mental, or functional ailment or defect." The Code does not exclude a pharmacologist from having training, knowledge, and understanding of the effects of drugs and toxins on the human body; it only excludes the practice of medicine, which is quite a different thing. Thus, an expert is qualified to render an opinion as to causation, "[p]rovided an expert witness is properly qualified in the field in which he offers to testify." *Orkin Exterminating Co. v. McIntosh*, 215 Ga. App. 587, 592 (4) (452 SE2d 159) (1994).

Where health care providers overlap in their fields of training and practice, a practitioner in one area has been permitted to testify as to the standard of care in such treatment; however, the areas must overlap in the area of testimony as to such standard of care. *Handson v. HCA Health Svcs. of Ga.*, 264 Ga. 293 (443 SE2d 831) (1994); *Hewett v. Kalish*, 264 Ga. 183, 186 (1) (422 SE2d 233) (1994); *Crook v. Funk*, 214 Ga. App. 213, 215 (2) (447 SE2d 60) (1994); *Tye v. Wilson*, 208 Ga. App. 253, 254-256 (430 SE2d 129) (1993); *Milligan v. Manno*, 197 Ga. App. 171 (397 SE2d 713) (1990); *Shaw v. Hosp. Auth. of Cobb County*, 507 F2d 625 (5th Cir. 1975); *Sandford v. Howard*, 161 Ga. App. 495, 497 (4) (288 SE2d 739) (1982). If an expert in the area of health sciences, which overlaps in another area of health sciences, can qualify as an expert witness to testify as to the standard of care exercised in the area of overlapping treatment, then it also follows that such expert can testify as to his or her opinion as to causation, etiology, even though the expert is not a holder of a medical degree. The issue is training, skill, and experience to give competence to give an opinion as to cause and effect of the deviation from the standard of care. This the foregoing cases permit.

*Chandler Exterminators v. Morris*, 262 Ga. 257 (416 SE2d 277) (1992), *Drake v. LaRue Constr. Co.*, 215 Ga. App. 453 (451 SE2d 792) (1994), and *Handy v. Speth*, 210 Ga. App. 155 (435 SE2d 623) (1993) essentially held that a neuropsychologist, who is trained to test for the existence of brain damage, lacks the expertise to give an opinion as to the etiology of such brain damage, because neuropsychology is not an overlapping field of practice with medicine, although it studies brain anatomy, morphology, and physiology.

" '[T]he law in Georgia does not require that only medical doctors be permitted to give testimony regarding a medical issue, but allows others with certain training and experience to testify on issues within the scope of their expertise.' " *Rainwater v. State*, 210 Ga. App. 594, 595 (3) (436 SE2d 772) (1993). Pharmacology and toxicology are such overlapping areas of science/medicine where the expert in either area has the expertise to render an opinion as to the etiology of a

drug and the effect on the human body.

*Hunnicutt v. Hunnicutt*, 237 Ga. 497 (228 SE2d 881) (1976) was a divorce case where the wife was allowed to testify that she had recurrent phlebitis with depressive reaction. There was no expert testimony to support this, and the husband appealed. The Supreme Court held regarding such non-expert testimony: "[t]he diagnosis and potential continuance of a disease are medical questions to be established by physicians as expert witnesses and not lay persons. *Metropolitan Life Ins. Co. v. Saul*, 189 Ga. 1 (5 SE2d 214) (1939); *Autry v. General Motors &c. Plant*, 85 Ga. App. 500, 502 (69 SE2d 697) (1952)." None of these cases dealt with a medical malpractice causation issue or testimony by an expert qualified in an overlapping science to give his or her opinion on causation.

In *Cherokee County Hosp. Auth. v. Beaver*, 179 Ga. App. 200 (345 SE2d 904) (1986), this Court dealt with a case in which no expert witness, whether medical or overlapping field of health care, testified as to causation; only the plaintiff testified. However, in Division 2 of the opinion a nurse set forth the standard of care for giving an intermuscular injection in the buttock and was allowed to do so by this Court; the nurse did not, as a practitioner in an overlapping area of health care, give an opinion as to causation.

In *Eberhart v. Morris Brown College*, 181 Ga. App. 516, 518 (1) (352 SE2d 832) (1987), this Court held in a contract dispute as to payment for medical treatment for a student-athlete for an alleged football injury that there was no expert testimony showing causation other than the plaintiff's own opinion. This was not a case of overlapping fields of health care where someone other than a physician sought to testify.

In *Goodman v. Lipman*, 197 Ga. App. 631, 633 (399 SE2d 255) (1990), this Court held that a pharmacologist was a competent expert in a medical malpractice case to testify regarding pharmacokinetics and pharmacodynamics of drugs, causation. "The law in Georgia does not require that only medical doctors be permitted to give testimony regarding a medical issue, but allows others with certain training and experience to testify on issues within the scope of their expertise. For example, a licensed registered nurse is qualified to testify as an expert witness within the areas of her expertise. (Cit.) *Hyde v. State*, 189 Ga. App. 727, 728 (377 SE2d 187) (1988)." (Punctuation omitted.) Id. This Court reversed where the non-physician pharmacologist expert opinion was denied admission.

*Chandler v. Koenig*, 203 Ga. App. 684 (417 SE2d 715) (1992), is distinguishable from this case in that it held that under OCGA § 9-11-9.1 (a) a pharmacologist could not testify as to the *standard of care of a physician*. "[The pharmacologist] possesses expertise in that area which probably far exceeds that of the average medical doctor.

However, other than [the pharmacologist's] bare assertion that he is familiar with the applicable standard of care, nothing in [his] affidavit explains how his pharmacological education or his professional duties ha[ve] provided him with expert knowledge of the standard of care in prescribing of drugs ordinarily employed throughout the general medical profession by physicians who are years removed from the intensive pharmacological training they received in medical school and for whom the prescribing of drugs is but one facet of their practice." Id. at 687. In this case the expert pharmacologist did not testify as to the *standard of care* but as to his field of expertise, *drug use and causation*, i.e., pharmacokinetics and pharmacodynamics, which the physician was supposed to have learned in medical school and which is the area of expertise of the pharmacologist.

I am authorized to state that Presiding Judge McMurray, Presiding Judge Pope, Judge Johnson and Judge Smith join in this special concurrence.

BIRDSONG, Presiding Judge, dissenting.

As I cannot agree Sinkfield established through competent evidence that any negligence of the appellees caused her miscarriage, I must respectfully dissent.

Pretermitting whether appellees were negligent, even giving Sinkfield the benefit of all reasonable doubt, and construing the evidence and all inferences and conclusions therefrom in her favor (*Moore v. Goldome Credit Corp.*, 187 Ga. App. 594, 595-596 (370 SE2d 843)), her evidence was not sufficient to withstand the grant of summary judgment. Although Dr. Thornton's testimony and affidavit expressed disagreement with the treatment rendered by appellees, she never stated that the appellees' actions caused the miscarriage. This is significant because Dr. Thornton was the physician who treated Sinkfield when she had this miscarriage. As a consequence, even though she examined both Sinkfield and the aborted fetus at that time, she could not attribute the cause of the miscarriage to any negligence of the appellees.

When asked specifically, "Could you believe that any different management of Ms. Sinkfield by Dr. Oh and Dr. Farmer up through and including January 7th of 1993, to a reasonable degree of certainty, could have prevented the miscarriage January 19th," Dr. Thornton responded, "I cannot say with a hundred percent degree of accuracy that anything — that anything I've mentioned that could have been done would have been — would have prevented her miscarriage, no." She was then asked, "The question is: With reasonable degree of medical certainty, understanding medicine is generally not a hundred percent situation?" Dr. Thornton responded, *"No."*

Thus, the sole issue in this appeal is whether the trial court

erred by finding that Dr. Proctor "is not a medical doctor and the court finds that his affidavit, which solely addresses the issue of Motrin prescribed for and used by the plaintiff, is not competent evidence which can be relied upon by the plaintiff to establish proximate cause." "Whether a witness has such learning or experience in a particular art, science, or profession to be treated as an expert, or to be deemed prima facie an expert, is a matter addressed to the sound discretion of the trial court, and such discretion will not be disturbed unless manifestly abused." (Punctuation omitted.) *McDonald v. Glynn-Brunswick Mem. Hosp.*, 204 Ga. App. 7 (418 SE2d 393). As the record does not support a conclusion that the trial court abused its discretion, I find no basis to reverse its decision.

"In this state in cases involving misfeasance by a professional, it has been the rule that the causal connection between tort and injury must result from the negligence of the professional and as the procedure is of a professional nature, the characterization of the professional conduct must be by one possessing sufficient expertise in that discipline." *Turner v. Malone*, 176 Ga. App. 132, 134 (4) (335 SE2d 404). Consequently, the affidavit of Dr. Proctor, a toxicologist and pharmacologist, does not save Sinkfield's case. "The diagnosis and potential continuance of a disease are medical questions to be established by physicians as expert witnesses and not by lay persons. [Cits.]" *Hunnicutt v. Hunnicutt*, 237 Ga. 497 (228 SE2d 881). "The requirement that expert testimony be adduced in a medical malpractice case is premised upon the existence in such a case of 'medical questions' which control its resolution. 'Medical questions' may be defined as those concerning highly specialized expert knowledge with respect to which a layman can have no knowledge at all, and the court and jury must be dependent on expert evidence." (Citation and punctuation omitted.) *Cherokee County Hosp. Auth. v. Beaver*, 179 Ga. App. 200, 204 (345 SE2d 904). Accord *Eberhart v. Morris Brown College*, 181 Ga. App. 516, 518 (352 SE2d 832).

Dr. Proctor did not claim to be a physician or to have been otherwise trained in ascertaining the cause of miscarriages. Instead, he claimed only to have "expert knowledge of the effects that dosages of Motrin-800 (ibuprofen, 800 milligrams) have on pregnant women and their fetuses at various stages of pregnancy." Dr. Proctor, however, did not state how he gained this expert knowledge or on what it is based. This is not sufficient. "Conclusory statements as to a witness' 'knowledge' or 'familiarity' in a particular art, skill or science are not probative in determining the witness' qualifications as an expert witness. Such determination must be based on evidence of the witness' education, training or experience in the pertinent field of study." *Goodman v. Lipman*, 197 Ga. App. 631, 632-633 (399 SE2d 255). Here, Dr. Proctor claimed to have expert knowledge of this subject,

but did not say how it was obtained, and the majority and concurring opinion are left to conjure up how that expertise might have been gained. Of course, the majority and the special concurrence might be correct, but then they just as likely could be wrong about what expertise Dr. Proctor might possess.

It is the responsibility of the party proffering the expert witness to establish that the witness is qualified to give his or her expert opinion. In this instance the majority and the special concurrence go from speculation about what Dr. Proctor's educational course of study might have been, to supposition about his qualifications, and finally to the assumption that his field of training and practice overlap with that of medical, health care providers. This is nice theory, but it is not a basis for concluding that this witness is qualified to give his expert opinion on the *medical question* of what caused this miscarriage.

Dr. Proctor merely states that based on his reviews of the medical records and relying upon his expertise as a pharmacologist and toxicologist, it was his professional opinion that the Motrin 800 prescribed by appellee "Farmer on December 24, 1992 was the predominant major contributing factor to the demise of the fetus" of Sinkfield and that this demise was "precipitated by Motrin-800 induced Oligohydramnios (deficit in amniotic fluid)."

Dr. Proctor, however, is not qualified and authorized to give an expert opinion on the cause of miscarriages. This is well demonstrated by Judge Eldridge's special concurrence. In all of the definitions set forth therein, not one states that a pharmacologist or toxicologist is in any way qualified to diagnose the cause of medical conditions either from the review of medical records or otherwise.

This is especially true when those medical records show the following: December 2, 1992, Sinkfield complained of awaking in a puddle of fluid; December 7, 1992, vaginal bleeding; December 15, 1992, pinkish discharge; December 19, 1992, continued vaginal bleeding; December 23, still bleeding vaginally with abdominal pains and pinkish discharge; December 24, 1992, abdominal pain, leaking fluid, vaginal bleeding, Motrin prescribed, threatened abortion; December 28, 1992, abdominal pains; January 12, 1993, increased risk for open neural tube defect on elevated MSAFP; January 19, 1993, Sinkfield came to hospital with fetus' buttocks presented, no amniotic fluid present. The reason stated for admission was "spontaneous abortion probable incompetent cervix." Sinkfield's medical records also showed that she had a history of vaginal bleeding, preterm rupture of membrane, preterm uterine contractions, history of multiple (recurrent) spontaneous abortions, spontaneous vaginal delivery, and that she had "three previous spontaneous abortions." Moreover, Dr. Thornton's assessment contained in Sinkfield's medical record

shows, "intrauterine pregnancy at 22 weeks with a spontaneous abortion, with retained placenta, history of recurrent spontaneous abortions, and an elevated alpha feto protein."

This is not a case in which a normal, healthy expectant mother is suddenly prescribed Motrin 800 and then a miscarriage results. Although I do not believe that Dr. Proctor would be qualified to diagnose the cause of the miscarriage in any case, he certainly is not qualified to diagnose the cause of the miscarriage in this case considering Sinkfield's medical history.

"While expert witnesses may give their opinions as to facts, principles, and rules involved in the science in which they are learned, they are not, as to questions lying out of the domain of the science, art, or trade in which they are experts, exempt from the restriction of the rule which requires witnesses to state facts and not opinions." *Chandler Exterminators v. Morris*, 262 Ga. 257, 258 (3) (b) (416 SE2d 277). Even though the General Assembly subsequently authorized psychologists to testify about the cause of brain injuries (see OCGA § 43-39-1 (3)), it did not legislatively overrule the principles on which *Morris* was based. Compare *Johnson v. Knebel*, 267 Ga. 853, 855, n. 6 (485 SE2d 451), citing *Morris* favorably.

"The opinions of expert witnesses as to questions of science, skill, trade, or other matters beyond the ken of the average layperson are always admissible, and such opinions may be based upon facts proved by other witnesses. [OCGA § 24-9-67.] However, before being qualified to render an opinion, the expert witness must be qualified as to the relevant area of expertise: 'While expert witnesses may give their opinions as to facts, principles and rules involved in the science in which they are learned, they are not, as to questions lying outside the domain of the science, art, or trade in which they are experts, exempt from the restriction of the rule which requires witnesses to state facts and not opinions.' [*Morris*, 262 Ga. at 258.]" *Johnson v. Knebel*, supra at 857-858. Here, Dr. Proctor purports to give his opinion on the cause of a miscarriage when nothing in his affidavit shows that he is qualified by training or experience to do so.

Thus, as Sinkfield did not show that Dr. Proctor had any expertise in fields other than pharmacology and toxicology, she did not establish that he was qualified to give an expert opinion on the cause of this miscarriage. "Expert knowledge is required to render an expert opinion." *Johnson v. Knebel*, at 859 (3). Further, none of the cases cited by the majority authorizes pharmacologists or toxicologists to testify outside their fields of expertise.

In this case, Dr. Proctor's affidavit is not limited to the scientific effect of Motrin or to connecting the Motrin to a cause of the miscarriage identified by a competent expert. Instead, his affidavit was offered to establish the *cause* of the miscarriage to the exclusion of all

other possible medical conditions, congenital defects, complications, diseases, or injuries — even those identified in Dr. Thornton's affidavit. Although Dr. Proctor may be qualified to testify about the effects of Motrin and other drugs, he is not qualified to give his opinion on the medical causation in this manner. This is especially true in this case in which no competent medical testimony, and especially that of the treating physician, established the cause of the miscarriage, and Sinkfield's medical history shows that she had miscarriages on three earlier occasions and this time was threatening a miscarriage *before* the Motrin was prescribed.

The majority's comment regarding the purported concession in the appellees' brief, distilled to its essence, says the appellees concede that if Dr. Proctor was not incompetent to render an opinion on causation, he could give competent testimony. Two problems exist with this statement: One, appellees made no such statement and, two, even if such statements were made, it would not be a concession that Dr. Proctor was competent to testify about the causation of the miscarriage, which is the issue here. It is because he was not competent to testify about this subject that his opinion has no probative value. OCGA § 43-34-20 (3) authorizes those practicing medicine to be engaged in the diagnosis of disease, defects, or injuries. No comparable statute authorizes pharmacologists or toxicologists to do so.

*With all of his knowledge of drugs and medications, nothing in Dr. Proctor's affidavit shows that he is even authorized to write a prescription for the dispensation of Motrin 800 in this state.* See OCGA § 26-4-2 (20). Further, based upon his affidavit, he is not qualified to state the standard of care in this case (see *Chandler v. Koenig*, 203 Ga. App. 684, 686-687 (417 SE2d 715)), and he is not qualified to sign a death certificate stating a cause of death.

Although the news that, after suffering three earlier miscarriages, Sinkfield with a different course of treatment successfully delivered a healthy baby is most welcome, that news is not relevant to whether Sinkfield established Dr. Proctor was competent to give an expert opinion in this case.

As the trial court did not abuse its discretion by rejecting Dr. Proctor's opinion, I would affirm the grant of summary judgment.

I am authorized to state that Chief Judge Andrews and Judge Blackburn join in this dissent.

DECIDED DECEMBER 5, 1997 —
RECONSIDERATION DENIED DECEMBER 18, 1997.

*Kenneth Dious & Associates, I. Kenneth Dious, The Kendall Law*

*Firm, Lisa R. Roberts*, for appellant.

*Alston & Bird, Susan B. Devitt, Debra R. Sydnor*, for appellees.