28 A.3d 98

**Rodney Patrick MORTON**

v.

**STATE of Maryland.**

**No. 2490, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Sept. 2, 2011.

530

Kellie M. Black (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for Appellant.

Sharon S. Street (Douglas Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: JAMES R. EYLER, MATRICCIANI, CHARLES E. MOYLAN, JR., (Retired, Specially Assigned), JJ.

MATRICCIANI, J.

Appellant, Rodney Patrick Morton, was convicted by a jury sitting in the Circuit Court for Worcester County of a third degree sex offense and second degree assault involving his nine-year-old daughter, I.M. The circuit court sentenced appellant to two years imprisonment, with all but six months suspended. Appellant timely noted the present appeal, and raises the following two issues for our review:

I. Did the trial court violate Md. Rule 4–326, by failing to timely notify defense counsel of a note sent by the alternate juror?

II. Did the trial court err in allowing Belle Goslee, a SAFE (sexual assault forensic examination) nurse, to testify as an expert witness?

We conclude that appellant did not preserve his complaint regarding the juror's note and that the trial court did not err or abuse its discretion in admitting expert testimony by Ms. Goslee.

## FACTS AND LEGAL PROCEEDINGS

At trial, the State presented the testimony of I.M., Tamara Thompson, and Belle Goslee to prove that appellant digitally penetrated his daughter's vagina. Their testimony set forth the following:

Appellant, who was a friend of Thompson's husband, had been living in the Thompson house for four or five weeks, along with appellant's two children. I.M. testified that on the evening of May 22, 2009, after she fell asleep on his bed, her father carried her to her own bed in another room. As he was doing so, he put his hand inside the leg of her shorts and digitally penetrated her vagina. I.M. stated that she kept her eyes closed throughout the encounter because she was afraid and unsure of what to do. She also stated that her father had sharp fingernails, and that the penetration hurt a great deal.

Once alone in her room, I.M. was scared and began to cry. Joe Thompson—Tamara Thompson's brother, who was also a guest in the house—found her crying and brought her to her father. I.M. told her father that her "private hurt." They called I.M.'s mother, but I.M. did not tell her about the incident that night because appellant was present.

The next morning, appellant asked Thompson to buy some cranberry juice while she and I.M. went grocery shopping because I.M. was still in pain, and he thought I.M. had a bladder or kidney infection. While out with I.M., Thompson asked the girl about her pain. Based on I.M.'s response, Thompson called I.M.'s mother. After talking to I.M., her mother immediately came to pick her up.

The following day, May 24, 2009, Belle Goslee, a SAFE nurse, examined I.M. in the Emergency Room at Atlantic General Hospital. I.M. was sullen and quiet and did not talk to Goslee throughout the examination. Goslee found what appeared to be a piece of lint on the border of I.M.'s exterior and inner labia. When she removed the material with a q-tip, she discovered a .5 centimeter tear that was red, had clean borders, and was slightly open, indicating that it was probably fresh. Based on this, Goslee opined that the tear was "consistent with the fact that there may have been digital [penetration] in that area." According to Goslee, such a tear would be immediately painful and was not a common injury for a nine-year old child. Because I.M. would not allow the nurse to continue the examination beyond that area, complaining that it was too painful, Goslee was unable to evaluate whether there were indications of vaginal penetration.

Appellant testified on his own behalf, confirming that he carried his daughter, of whom he had custody, to her bed after she fell asleep. Although he pulled the leg of her shorts down when it rode up, he denied contacting her genital area at any time. When I.M. returned to his room about forty-five minutes later, she was crying, and she told him that her genitals hurt. Appellant called I.M.'s mother to discuss the problem, and they agreed to give her cranberry juice for a possible yeast or bladder infection, as they had successfully done with prior infections.

Based on this evidence, the jury found appellant guilty of a third degree sex offense and second degree assault. Additional facts will be provided as necessary.

## DISCUSSION

### I. COMMUNICATION FROM ALTERNATE JUROR

Appellant first contends that the trial court erred by failing to give timely notice to defense counsel of a note sent by the alternate juror, in violation of the mandate in Maryland Rule 4–326. Rule 4–326(d) provides, in pertinent part, that "[t]he court shall notify the defendant and the State's Attorney of

the receipt of any communication from the jury pertaining to the action as promptly as practicable and in any event before responding to the communication."

It appears that a note from the alternate juror was delivered to the bailiff sometime after Ms. Thompson, who had been sequestered, entered the courtroom to testify as the second of the prosecution's three witnesses in its case-in-chief. The note explained that the alternate juror knew the individual who had come into the courtroom with Ms. Thompson because they worked together. The trial judge took no action at that time. After completing her testimony, Thompson left the courtroom. Ms. Goslee testified immediately thereafter, and the State then rested its case-in-chief. Just before appellant took the stand as the sole witness in his defense, there was a ten-minute recess. Before sending the jury out of the courtroom, the trial court gave the following instruction:

> Ladies and gentlemen of the jury, as you heard that's the completion of the State's case. What we are going to do now is take about a ten-minute recess. As you go back for this recess, the case obviously is not ready for your consideration. So, as you go back, during the recess, please don't discuss among yourselves anything about the case at this point. You are not able to do that until I send you out at the completion of the case and instruct you to do so.

When the jury returned, appellant testified. Without another recess, the State presented a rebuttal witness, the court instructed the jury, and closing arguments were presented. The alternate juror was thereafter excused, and deliberations began at 12:05 p.m. The trial judge then gave the following explanation to counsel:

> All right. Folks, I just wanted to let you know that at some point during the trial, that the alternate juror passed a note to the Bailiff that, in fact, he knew whoever the person was that came in with Ms. Thompson. She was accompanied by a male and he passed a note to the Bailiff that he assume[d] it was her husband and that he worked with her husband.

Seeing as this was going to be a quick trial and his services probably weren't going to be needed I let it go at that because, obviously, this isn't going to affect his decision, as he is gone. But I just wanted you to be aware of that fact.

Appellant contends that the trial court's failure to notify the parties immediately upon receiving the note constitutes a violation of the mandate in Rule 4–326(d). In his view, "[t]he proper course of action . . . was to call the parties to the bench as soon as [the court] received the note," and he argues that "the simple fact that the alternate juror was ultimately excused does not affirmatively show that [appellant] was not prejudiced[.]" In particular, he argues:

Had Mr. Morton's counsel been promptly notified of the note, she might have: 1) asked the trial court to find out who the man was; 2) asked the trial court to question the alternate juror regarding the nature of his relationship with this man; 3) asked the trial court to ask the alternate juror whether or not he had spoken to the man about the facts of this case; 4) asked the alternate juror whether he had spoken to the other jurors about any such facts; and 5) cautioned the alternate juror against discussing any such facts with other jurors.

The State counters that the court did not violate the Rule because it did not respond to the communication, that appellant received timely notice of the note, that appellant was not prejudiced by any delay in disclosing the note because the juror did not participate in deliberations, and that defense counsel's failure to object at trial to the court's handling of the note precludes appellant's challenge. We agree that the issue was not preserved for our review, and that, even if preserved, the circuit court's actions did not constitute reversible error. We explain.

## A. Preservation

Maryland Rule 8–131(a) governs the scope of appellate review and provides, in part, that "[o]rdinarily, the appellate court will not decide any other issue unless it plainly appears

by the record to have been raised in or decided by the trial court." When the trial judge informed the attorneys about the excused juror's note, defense counsel did not object or otherwise comment on the judge's decision not to communicate with the remaining jurors regarding the note. Thus, this issue has not been preserved for appeal. Even if preserved, however, appellant's argument is to no avail.

### B. Prejudice

It is true that the constitutional guarantee to a criminal defendant to be present at every stage of his trial includes the right to be present whenever the court communicates with the jury in any way. *See Perez v. State,* 420 Md. 57, 21 A.3d 1048 (2011), and *Bunch v. State,* 281 Md. 680, 683–84, 381 A.2d 1142 (1978). It is also true, however, that such a communication will not be grounds for reversal if the record "affirmatively shows that such communications were not prejudicial or had no tendency to influence the verdict of the jury." *Midgett v. State,* 216 Md. 26, 36–37, 139 A.2d 209 (1958). For the reasons explained below, the record in this case affirmatively shows that the communication sent by the alternate juror and the court's subsequent dismissal of the alternate juror were not prejudicial to appellant and had no tendency to influence the verdict of the jury.

In *Smith v. State,* 66 Md.App. 603, 624, 505 A.2d 564, *cert. denied,* 306 Md. 371, 509 A.2d 134 (1986), we stated that "[w]hile [Rule 4–326(d) ] expressly requires notice to the parties of any communication from the jury, its very spirit is to provide an opportunity for input in designing an appropriate response to each question in order to assure fairness and avoid error." *See also Stewart v. State,* 334 Md. 213, 223, 638 A.2d 754 (1994). The most vital protection afforded by the rule, therefore, is the ability of the defendant to have input in fashioning a proper response to the jury, particularly in situations where the jury has questions about the law to be applied in reaching its verdict. In the present case, it is undisputed that the court did not respond to the note, thereby precluding any complaint that the court violated Rule 4–326(d)

by communicating with the jury without giving defense counsel an opportunity for input.

As explained above, when the trial judge then informed the attorneys about the excused juror's note, defense counsel did not object or otherwise comment on the judge's decision not to communicate with the remaining jurors regarding the note. As a result, the judge did not make any of the inquiries that appellant now argues should have been pursued in order to rule out the possibility that the alternate juror had discussed his acquaintance with other jurors in a manner that might prejudice appellant. The only opportunity for conversation among jurors was the ten-minute recess after the State's case in chief, immediately prior to which the jury was admonished not to discuss "anything about the case." In addition, the juror's communication in this case was merely a statement that he worked with the man who had accompanied Ms. Thompson into the courtroom, not a revelation about a personal relationship with the witness herself, or a question about law or facts relating to the case.[1] *C.f. Taylor v. State,* 352 Md. 338, 345, 722 A.2d 65 (1998) (holding that the trial court erred when it answered questions it received from the jury on specific points of law relating to the various crimes with which the defendant was charged, before notifying the defendant of their receipt).

Perhaps most importantly, the alternate juror was dismissed prior to jury deliberations, and therefore, any connection he may have had with Ms. Thompson could not have affected the jury's verdict. We therefore hold that the circuit court's actions with regard to the alternate juror's communication do not constitute reversible error.

## II. Expert Testimony by SAFE Nurse

Appellant next contends that the trial court erred in permitting Belle Goslee, the SAFE nurse who examined I.M., to

---

1. In fact, the alternate juror's "relationship" with the individual who accompanied Ms. Thompson was apparently not close enough for him to have recognized Ms. Thompson as someone connected with his co-worker during voir dire.

testify as an expert witness. Appellant first objected to Ms. Goslee's testimony in a motion in limine prior to trial, arguing that the State had failed to identify her timely as an expert witness, as required by Md. Rule 4–263(d). The trial court denied the motion, and permitted Ms. Goslee to take the stand. After conducting voir dire of Ms. Goslee prior to her qualification as an expert, appellant again objected to her testimony, arguing that she was not qualified to render an expert opinion regarding the significance of her findings in a pediatric patient, citing Md. Rule 5–702. We shall separately address—and reject—both arguments.

### A. Discovery Sanction

■ Under Maryland Rule 4–263(n), a trial court may exclude expert testimony as a sanction for failure to comply with mandatory discovery obligations. Appellant contends that "[t]he trial court should have excluded Ms. Goslee's expert testimony as a sanction for the State's discovery viola-tion[ ]" because, "although the State had identified Ms. Goslee as a lay witness and had provided the defense with a copy of her report at some earlier date, the State failed to inform the defense that it intended to call Ms. Goslee as an expert witness until one week before trial." *See* Md. Rule 4–262(d)(2)(D) (requiring prosecution to timely disclose name of testifying expert and substance of findings and opinions).

The State responds that appellant waived this complaint by failing to renew his pre-trial objection at the time Goslee's testimony was offered at trial. Alternatively, the State argues that the court did not abuse its discretion in denying appellant's motion to exclude the expert testimony as a discovery sanction.

■ Under Maryland Rule 4–323(a), "[a]n objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived." This requirement means that "when a motion in limine to exclude evidence is denied, the issue of the admissibility of the evi-

dence that was the subject of the motion is not preserved for appellate review unless a contemporaneous objection is made at the time the evidence is later introduced at trial." *Klauenberg v. State*, 355 Md. 528, 539, 735 A.2d 1061 (1999). *See also Prout v. State*, 311 Md. 348, 356, 535 A.2d 445 (1988) ("If the trial judge admits the questionable evidence, the party who made the motion ordinarily must object at the time the evidence is actually offered to preserve [an] objection for appellate review.").

In this case, when Ms. Goslee was proffered as an expert at trial, defense counsel only objected on the ground that she was not qualified as a pediatric examiner. When the prosecutor elicited Goslee's expert testimony, including her opinion that the labial tear she observed was not a common injury in nine-year-old girls, defense counsel did not object. We therefore agree that appellant failed to preserve his "discovery sanction" objection to Goslee's expert testimony.

Appellant cites *Dyce v. State*, 85 Md.App. 193, 582 A.2d 582 (1990), to support his argument that the issue was preserved. In *Dyce*, the defendant made a motion in limine to exclude evidence of a prior criminal conviction at the close of the State's case in chief, which the trial court denied. The objection was not renewed during the State's cross examination of the defendant. On review, our Court recognized that ordinarily, "denial of [a motion in limine] . . . did not excuse the defense from objecting to questions concerning that evidence" during witness testimony. *Id.* at 197–98, 582 A.2d 582. We chose to consider the issue nonetheless, because the trial court's ruling on the motion in limine, and the "prosecutor's inquiry as to appellant's prior criminal record, the first question posed on cross-examination, was separated only by appellant's direct examination," which was very short, and which contained nothing "bearing upon the exercise of the court's discretion to admit evidence of the prior conviction." *Id.* at 198, 582 A.2d 582. In the present case, however, the motion in limine was made at the start of trial, and was separated from Ms. Goslee's testimony by opening statements and the testimony of both I.M. and Ms. Thompson. Thus, the same

"temporal proximity" that existed in *Dyce* does not exist here. Moreover, the objection in *Dyce* was to the State's impeachment of the defendant—who was charged with possession of cocaine—using a prior conviction for distribution of cocaine, while the objection in the present case was based on an alleged discovery violation. Thus, where in *Dyce* our Court may have felt compelled to consider the issue "despite the lack of literal compliance with Rule 4–323(a)" due to the level of prejudice to the defendant, we do not feel the same urgency here, when discovery sanctions and their remedies have long been deemed within the sound discretion of the trial judge. *See Pantazes v. State,* 141 Md.App. 422, 443–44, 785 A.2d 865 (2001).

Even if appellant had preserved this objection, we are not persuaded that the trial court abused its discretion in declining to exclude Goslee's expert testimony as a discovery sanction. "Trial judges are vested with great discretion in applying sanctions for discovery failures," so that appellate review is "under an abuse of discretion standard." *Rodriguez v. Clarke,* 400 Md. 39, 57, 66, 926 A.2d 736 (2007). "The exercise of [such] discretion contemplates that the trial court will ordinarily analyze the facts and not act, particularly to exclude, simply on the basis of a violation disclosed by the file." *Taliaferro v. State,* 295 Md. 376, 390, 456 A.2d 29 (1983). Factors relevant to whether exclusion of evidence is warranted as a discovery sanction include "the timing of the ultimate disclosure," as well as "the degree of prejudice to the parties respectively offering and opposing the evidence, whether any resulting prejudice might be cured by a postponement and, if so, the overall desirability of a continuance." *Id.* at 390–91, 456 A.2d 29. *See also Thomas v. State,* 397 Md. 557, 570–71, 919 A.2d 49 (2007) ("In exercising its discretion regarding sanctions for discovery violations, a trial court should consider . . . the existence and amount of any prejudice to the opposing party . . . [and] the feasability [sic] of curing any prejudice with a continuance").

 The Court of Appeals has cautioned that "[e]xclusion of evidence for a discovery violation is not a favored sanction and is one of the most drastic measures that can be imposed." *Thomas*, 397 Md. at 572, 919 A.2d 49. Consequently, the general rule is that when "fashioning a sanction, the court should impose the least severe sanction that is consistent with the purpose of the discovery rules." *Id.* at 571, 919 A.2d 49. This reflects that discovery sanctions are designed " 'to prevent a defendant from being surprised,' " not to " 'yield a defendant the windfall of exclusion every time the State fails to' " comply with discovery rules. *Id.* at 574–75, 919 A.2d 49 (quoting *Ross v. State*, 78 Md.App. 275, 286, 552 A.2d 1345 (1989)).

Here, appellant did not claim to be surprised that Goslee would testify about her examination findings, because the State timely disclosed her as a lay witness and provided defense counsel with her written report. Instead, defense counsel maintained that the State's formal designation of Goslee as an expert witness one week before trial surprised her and prejudiced appellant, in that she had not been planning to present an expert witness to respond to Goslee's report due to the State's failure to designate one.

The trial court then asked defense counsel, "What efforts did you make to get an expert once you were notified?" As set forth below, defense counsel's response persuaded the court to deny the motion to exclude Goslee's expert testimony.

[Defense Counsel]: I have not sought out an expert since I was notified.

The Court: Why is that?

[Defense Counsel]: I really don't know, Your Honor. I received it a week ago. I have not ... all I can say is I have not sought out an expert.

The Court: So, if you haven't tried to do anything in a week, how am I to believe that, in fact, if you had more notice than a week that you would have gotten an expert?

[Defense Counsel]: I am aware that our [Public Defender] office has used sexual abuse experts before in cases of this

nature, so I know that there is a possibility experts are available. However, I'm not able to say that one would or would not be available in this case.

The Court: Well, once you got the report, wouldn't it have been a matter of a phone call to find out if there was anybody available to review Ms. Goslee's report to determine whether they would, based on that, give a different opinion?

[Defense Counsel]: I suppose I would have had to provide the report to someone in the Forensics Division of our office to determine whether or not there is an expert available on this issue.

The Court: All right. Well, if, in fact, you had done that, and you had information that the expert wasn't able within this short period of time to provide you any information, I think you would be sitting in a different situation. But since you didn't do that, I'm going to deny your motion *in limine.*

Because defense counsel made no effort to mitigate the prejudice caused by the late disclosure of Goslee as an expert witness, we cannot say the trial court abused its discretion in denying appellant's motion to exclude her expert testimony as a discovery sanction.

### B. Expert Qualification

■■■ Appellant's alternative contention is that "Ms. Goslee was not qualified to give expert testimony regarding the significance of her findings in a pediatric patient." In his view, "[t]he record in this case fails to show that Ms. Goslee had a measure of training or experience with pediatric patients sufficient to qualify her to render an expert opinion as to the significance of her findings in her examination of I.M."

Under Maryland Rule 5–702,

[e]xpert testimony may be admitted ... if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine ...

whether the witness is qualified as an expert by knowledge, skill, experience, training, or education. . . .

"To qualify as an expert, one need only possess such skill, knowledge, or experience in that field or calling as to make it appear that [the] opinion or inference will probably aid the trier [of fact] in his search for the truth." *Thanos v. State*, 330 Md. 77, 95, 622 A.2d 727 (1993) (internal quotations marks and citations omitted). A trial court has broad discretion over the admissibility of expert testimony. *Oken v. State*, 327 Md. 628, 659, 612 A.2d 258 (1992). Appellate courts therefore review a decision to admit expert testimony for abuse of discretion, a determination that seldom results in reversal. *Id.*

In this case, Goslee was thoroughly questioned about her expert qualifications as a forensic nurse examiner, as follows:

[Prosecutor]: Good morning. Can you state your name and occupation for the record, please?

[Ms. Goslee]: Belle Goslee, and I'm a registered nurse.

Q: And how long have you been a registered nurse?

A: I've been a registered nurse for 22 years.

Q: And in order to become a registered nurse, what education have you gone through?

A: I have an Associates Degree, which is a two-year degree. And I am also six classes away from my Bachelor's Degree.

Q: And what training have you received as a registered nurse?

A: As a registered nurse, two years of college, and then over the course of the 20 years continuing education.

Q: Are you also qualified as a SAFE nurse?

A: I am a forensic nurse examiner.

Q: And what training have you received for that?

A: I'm adult and pediatric certified. In the State of Maryland we are governed by the Board of Nursing, so our license actually reads forensic nurse examiner. And for that you have to do a 40–hour week adult training with a

40–hour week clinical training. And for the adult training, part of that training is spent doing exams in child advocacy centers and pediatrician's offices. So the total you have to do, my training that I did for adult through Virginia, I had to do 100 pelvic exams in order to be certified.

Q: Okay. And where are you currently employed?

A: Atlantic General Hospital.

Q: And how long have you been employed there?

A: 16 years.

Q: And about how many patients have you seen as a forensic nurse examiner since you've been there?

A: 40.

Q: And does that include children and—

A: Yeah, 30 adults and approximately ten children.

[Prosecutor]: Your Honor, at this time I would like to offer Ms. Goslee as an expert in the field of forensic examination.

The Court: Any voir dire, Ms. Simpson?

[Defense Counsel]: Yes, Your Honor.

The Court: Go ahead.

[Defense Counsel]: You indicated that you went through training in Virginia for forensic nursing?

[Ms. Goslee]: For the adult portion, yes.

Q: How long ago was that?

A: Five years ago.

Q: And that was the training that involved 100 pelvic exams?

A: That's correct.

Q: And I believe you testified that during your employment at Atlantic General Hospital you've done 40 exams, ten of which were on children?

A: Approximately, yes.

Q: And since the training you received five years ago in Virginia, what continuing education have you done in the field of forensic nursing?

A: A lot. We have to do so many hours to keep our certification for the State. There are only, maybe three states that have forensic nurses that are governed by their State licensing and Maryland is one of those.

So we have stringents, we have to do so many hours on call, we have to do so many cases in order to maintain our certification.

Q: And are the cases that you do peer-reviewed?

A: Yes, they are.

Q: And approximately how many peer-review cases have you had to do?

A: All of our cases go back to our coordinator and are reviewed. . . .

Q: The certifications that you received, is that a training as to how conduct the exam?

A: It's the complete training.

Q: So you've trained on how to conduct the exams—

A: Correct.

Q: —as part of your training?

A: Yes.

Q: Are you trained on how to interpret the exam?

A: Yes.

Q: And are there standards as to what information you are to use to interpret an exam?

A: There certainly are standards. Our policies and procedures for our hospital are based on the International Association of Forensic Nurses policies and procedures. . . .

Q: If someone reviews your work, a peer review of an exam that you had done, what exactly are they reviewing? Are they reviewing your conclusion or just that the exam was conducted correctly?

A: They're reviewing that the policy and procedure was followed, that the correct exam was done, and that the findings correlated with the exam.

Q: Are you provided with the result of the peer review?

A: Yes. Quality improvement.

Appellant argues that Goslee's testimony that "some unspecified 'part' of her training included performing exams in child advocacy centers and pediatrician's offices" and that "she had performed ten pediatric examinations as a forensic nurse examiner" did not constitute "enough to qualify her as an expert in pediatric forensic examination." We disagree.

The testimony set forth above establishes that Goslee had the specialized "knowledge, skill, experience, training, [and] education" to conduct pediatric forensic examinations. *See* Md. Rule 5–702. Defense counsel was free to ask Goslee to break down her pediatric training hours but did not do so. Although Goslee did not specify how many of her 80 clinical training hours had been devoted to pediatric examinations, it was undisputed that she completed the hours necessary to obtain State certification as a pediatric forensic examiner. Her training included not only how to conduct pediatric examinations, but also how to interpret examination findings in accordance with standards established by the International Association of Forensic Nurses. Approximately ten of the forty examinations—one quarter—that Goslee performed during her five years in practice as a SAFE nurse had been of pediatric patients, and all of those were peer reviewed.

On this record, we hold that the trial court did not abuse its discretion in determining that Goslee's testimony was likely to aid the jury in evaluating I.M.'s claim of digital penetration by appellant, which was the central contested issue in the case. Accordingly, the court did not err in admitting her expert testimony.

**JUDGMENTS OF THE CIRCUIT COURT FOR WORCESTER COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**